

DA 12-0616

IN THE SUPREME COURT OF THE STATE OF MONTANA

2013 MT 171

STATE OF MONTANA, DEPARTMENT OF REVENUE,

      Petitioner, Appellant and Cross-Appellee,

      v.

CAROL LEE HEIDECKER,

      Respondent, Appellee and Cross-Appellant.

| | |
|---|---|
| APPEAL FROM: | District Court of the Eighteenth Judicial District, In and For the County of Gallatin, Cause No. DV 12-98A Honorable Holly Brown, Presiding Judge |

COUNSEL OF RECORD:

      For Appellant:

          Amanda L. Myers, Michelle R. Dietrich, Special Assistant Attorney General, Montana Department of Revenue; Helena, Montana

      For Appellee:

          Michael Green, D. Wiley Barker, Crowley Fleck PLLP; Helena, Montana

Submitted on Briefs: May 28, 2013

Decided: July 2, 2013

Filed:

_____
                  Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1      Appellant Department of Revenue (DOR) appeals from the order of the Eighteenth Judicial District, Gallatin County, in favor of Appellee Carol Lee Heidecker (Heidecker), on a petition for judicial review of a property tax dispute. We affirm.

¶2      We address the following issue on appeal:

¶3      *Whether the District Court properly interpreted the "effectively prohibit" language in § 15-7-202(5), MCA, with respect to the restrictive covenants attached to Heidecker's property?*

## PROCEDURAL AND FACTUAL BACKGROUND

¶4      Heidecker purchased a 240-acre parcel of land in Gallatin County, Montana in 1980. The property had served as a dairy farm and gravel pit before the purchase. Heidecker has lived in one of the two houses on the property since the purchase. Heidecker's uncle originally lived in the other house. Heidecker sold the other house to Linda and Jerry Crisp (Crisps) in 1995 after the uncle's death. Heidecker shut down the dairy operation shortly after the purchase, but has rented out the land continuously for grain and hay production since about 1980. Heidecker subdivided a 30-acre parcel of this property into one-acre parcels in 1995. The subdivision is known as Bridger Lake Meadows (BLM). Heidecker adopted covenants for BLM at the time that he subdivided the property. The covenants reflect Heidecker's intent "to create thereon a residential community."

¶5      In particular, Article XI, Section 2, of the covenants provides that "[e]ach and every one of the Lots shall be used for private residential purposes only." The covenants enforce

2

this intent by limiting construction to "one single family residence structure" and an attached garage. With respect to agriculture, the covenants prohibit the landowners from engaging in activities that would result in noise or vibration, light, odor, dust, smoke, or other air pollution. The covenants further prohibit landowners from owning and keeping livestock or other animals used for commercial purposes.

¶6    Heidecker discussed the covenants with Ty Typolt, Area Manager for DOR, at the time that he created the covenants. Heidecker had concerns that adoption of the covenants could trigger a property tax reclassification of the BLM property. Typolt apparently agreed that adoption of the covenants would not change immediately the agricultural classification of BLM to a residential classification. Typolt further agreed that lots at BLM would be reclassified as residential once they were sold for residential purposes. Heidecker also met with the Gallatin County planning staff and the City of Belgrade Planning Director to ensure that he could continue to use the property for agriculture. The Planning Director assured Heidecker that no provisions of the Gallatin County Subdivision Regulations barred the continued agricultural use of BLM. Heidecker has sold no lots in BLM. BLM remains in hay and grain production.

¶7    DOR reviewed BLM's covenants as part of its 2009 reappraisal. DOR reclassified BLM from agricultural land to residential tract land. Heidecker filed a request for informal review with DOR on the grounds that "[n]othing has changed on the land or its usage." DOR denied Heidecker's request due to the restrictions imposed by the covenants. Heidecker appealed to the Gallatin County Tax Appeal Board (GCTAB).

3

¶8     GCTAB held a hearing on Heidecker's appeal after which it upheld DOR's reclassification. GCTAB did not rely on the prohibition in the covenants. GCTAB instead determined that BLM "meets at least 3 of the criteria for a subdivision" contained in ARM 42.20.156(1)(d), and, therefore, "cannot be considered agricultural land." Heidecker appealed the GCTAB's decision to the State Tax Appeal Board (STAB).

¶9     DOR argued before STAB that two factors supported reclassification of BLM. DOR first argued that the covenants limited the land to residential use. DOR also argued that BLM had been platted and that BLM met four of the infrastructure criteria contained in ARM 42.20.156(1)(d): paved road, utilities, a fire hydrant, and landscaping. STAB disagreed.

¶10    STAB determined that Heidecker's property satisfies the statutory test for agricultural classification "because, in the aggregate, it totals 240 acres, less a few acres for the two residences on the property, and it is actively devoted to agricultural use." STAB rejected application of the improvements criteria contained in ARM 42.20.156(1)(d) due to the fact that "the evidence demonstrated that the land does not meet any three of the criteria." STAB also concluded that the covenants did not "effectively prohibit" agricultural use of BLM. STAB reasoned that covenants simply represent "agreements between neighbors" that can be enforced "only by those neighbors." No neighbors, including Crisps, ever have objected to the agricultural use of the land. More importantly, Heidecker continuously has "raised agricultural crops on the land." STAB deemed this continuous agricultural use "clear proof" that the covenants have not effectively prohibited agricultural use.

4

¶11   DOR petitioned for judicial review on the sole issue of whether STAB properly interpreted the phrase "effectively prohibit" as set forth in § 15-7-202(5), MCA, and the attendant implications for the term "prohibit" as used in ARM 42.20.156. The District Court interpreted the "effectively prohibit" language to mean to "forbid and action in a way that accomplishes the purpose and brings about the expected result." The District Court determined that evidence in the record established that the covenants had failed to accomplish effectively "any prohibition on the agricultural use of the land." DOR appeals.

## STANDARD OF REVIEW

¶12   We review a district court's decision regarding an administrative order issued by STAB to determine whether the district court correctly interpreted the law. *Puget Sound Energy, Inc. v. Montana Dep't of Revenue*, 2011 MT 141, ¶ 14, 361 Mont. 39, 255 P.3d 171.

## DISCUSSION

¶13   *Whether the District Court properly interpreted the "effectively prohibit" language in § 15-7-202(5), MCA, with respect to the restrictive covenants attached to Heidecker's property?*

¶14   Section 15-7-202(5), MCA, provides that land may not be classified or valued as agricultural land "if it has stated covenants or other restrictions that effectively prohibit its use for agricultural purposes." DOR argues that the District Court improperly looked beyond the statute's plain language to analyze the actual purpose to which the land has been put. DOR further argues that the District Court improperly looked beyond the plain language of the covenants in an attempt to glean the landowner's intent. DOR urges the

5

Court to constrain its analysis to whether the written provisions of the covenants prove legally sufficient to "effectively prohibit" agricultural use.

¶15 The District Court interpreted the phrase "effectively prohibit" "to forbid an action in a way that accomplishes the purpose and brings about the expected result." Article XI, Section 2, of the covenants requires that all lots in BLM "shall be used for residential purposes only." This straightforward language makes clear that no purposes other than residential will be tolerated for lots in BLM. The covenants further discourage non-residential purposes through prohibitions on commercial livestock operations and on conduct that produces "odor, dust, smoke, or other air pollution." A BLM lot owner who seeks to engage in agricultural activities would be hard pressed to evade these clear restrictions in any action brought by another BLM lot owner who would seek to enforce the covenants.

¶16 We face a situation, however, in which no lot owner seeks to enforce the covenants. The only two lot owners in BLM, whose ownerships predate the subdivision, have acquiesced to the continuation of agricultural operations on the property for many years. STAB specifically determined that Heidecker and Crisps agreed to permit continued agricultural use of the land, Crisps never have objected to the agricultural use of the land, and most importantly, the land has been used continuously to grow crops. We agree with the District Court that nothing in § 15-7-202(5), MCA, requires us to ignore these facts when we apply the statute to the covenants.

¶17 It remains difficult to argue that the covenants forbid agricultural activities "in a way that accomplishes the purpose and brings about the expected result" when agriculture has

6

continued on the BLM lots since the adoption of the covenants. Restrictive covenants provide contractual rights to the beneficiaries of the covenants. *McKay v. Wilderness Dev., LLC*, 2009 MT 410, ¶ 58, 353 Mont. 471, 221 P.3d 1184. No current beneficiary of the covenants – neither Heidecker nor Crisps – has chosen to exercise these contractual rights. We decline to allow DOR, in effect, to enforce the contractual rights provided by the covenants in this case when the land continues, without opposition, to be used for agricultural purposes.

¶18 This outcome also comports with the principle of Montana's property tax system that "[a]ll lands must be classified according to their use or uses." Section 15-7-103(2), MCA. The statutes specifically recognize that the market value of many agricultural properties derives from "speculative purchases that do not reflect the productive capability of agricultural land." Section 15-7-201(1), MCA. This concern with speculation drives the legislative intent that "bona fide agricultural properties be classified and assessed at a value that is exclusive of values attributed to urban influences or speculative purposes." Section 15-7-201(1), MCA.

¶19 DOR retains the ability to evaluate in the future whether BLM continues to be used for "bona fide" agricultural purposes. STAB determined that no doubt currently exists on this point. Once Heidecker begins to sell or market lots at BLM, or once Heidecker stops using the property for agricultural purposes, DOR may evaluate anew whether the covenants "effectively prohibit" agriculture as contemplated by the amendment to subsection (5). Until that time, however, we agree with the District Court that Heidecker's continued use of the

7

land for agricultural purposes belies any claim that the covenants "effectively prohibit" agricultural purposes.

¶20    Affirmed.

/S/ BRIAN MORRIS

We concur:

/S/ BETH BAKER
/S/ LAURIE McKINNON
/S/ MICHAEL E WHEAT
/S/ JIM RICE